## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**HD**

Rcv'd by:_____

JESMOND O. RIGGINS
1622 Northwick Road,
Baltimore, MD 21218

USDC- BALTIMORE
'26 APR 20 AM9:03

Plaintiff,

v.

Civil Action No.: **BAH 2 6 CV 1 5 1 8**

MAYOR AND CITY COUNCIL OF
BALTIMORE
100 N. Holliday Street
Baltimore, MD 21202

JAMAL G. TURNER
Chair, Police Accountability Board
c/o Baltimore Police Accountability Board
7 E. Redwood Street, 9th Floor
Baltimore, MD

AMBER W. GREENE
Director, Office of Equity and Civil Rights
and the Police Accountability Board
c/o Office of Equity and Civil Rights
7 E. Redwood Street, 9th Floor
Baltimore, MD

CAYLIN A. YOUNG
Former Deputy Director, Office of Equity and
Civil Rights
c/o Office of Equity and Civil Rights
7 E. Redwood Street, 9th Floor
Baltimore, MD

Defendants.

## COMPLAINT

## SECTION 2 — PRELIMINARY STATEMENT

1. This civil rights action arises from Plaintiff's unlawful removal from a fixed-term, statutorily protected public office and from Defendants' adoption and implementation of a legal interpretation that nullifies express statutory safeguards governing Baltimore City's police accountability system.

2. Plaintiff, Jesmond O. Riggins, is a duly appointed member of the Baltimore City Police Accountability Board ("PAB") who was designated, sworn, and commissioned to serve on the Administrative Charging Committee ("ACC"), a quasi-adjudicatory body created under Maryland law. Upon commissioning, Plaintiff signed the Charter test book and received the City seal, thereby assuming the status of a city officer under the Baltimore City Charter ("Charter").

3. The ACC is a statutorily created body responsible for reviewing police misconduct investigations and determining whether administrative charges should be brought against law enforcement officers.

4. The Baltimore City Code ("Code") provides that ACC members serve fixed three-year terms, are compensated, and may be removed only by the Mayor and only for cause. Plaintiff was appointed to a three-year term ending May 30, 2026.

5. Plaintiff has a long-standing history of internal advocacy and resisting efforts to consolidate control over civilian oversight, dating back to his service as the Office of Equity and Civil Rights ("OECR") Civilian Review Board Supervisor from 2016–2019.

6. On November 14, 2025, Defendant Turner unilaterally removed Plaintiff from the ACC and assumed the seat himself, approximately six (6) months before the expiration of Plaintiff's term. Turner acted without mayoral involvement, without cause, and without

any process. He relied exclusively on a Baltimore City Law Department ("Law Department") interpretation that recharacterized Plaintiff's position as an at-will "ex officio" role.

7. Defendant Turner's action followed Plaintiff's testimony before Baltimore City Council's Public Safety Committee ("Public Safety Committee") on November 4, 2025, where Plaintiff testified in support of oversight independence from the Law Department and OECR, criticized legal interpretations advanced by the Law Department and warned that those interpretations would undermine oversight independence.

8. During the hearing, Defendant Young testified against PAB independence.

9. Immediately following the hearing, Defendant Young told Plaintiff, "You've got a lot going on with you. You're in trouble." On Jan 21, 2026, Defendant Young sent Plaintiff a text message to clarify, stating, "To be clear I said you're terrible" and directed Plaintiff to "get your facts straight before speaking on my name."

10. Within two (2) days of Plaintiff's testimony, Defendants engaged in communications reflecting intent to displace Plaintiff from ACC. Within ten (10) days of Plaintiff's testimony, Defendant Turner displaced Plaintiff from ACC.

11. The Law Department's interpretation of the Code, upon which Defendant Turner relied, produced a series of structurally inconsistent outcomes that conflict with the text, structure, and purpose of the Code. Under that interpretation, the Code is construed to:

    a. permit the PAB Chair to remove a designated ACC member without cause, process, or explanation, while the Mayor remains statutorily restricted to removal only for cause;

b. treat the PAB Chair and a designate member – both of whom exercise identical statutory authority – as subject to materially different tenure and removal protections; and

c. allow an individual to continue occupying an ACC seat through successive roles without being subject to the same fixed-term and removal restrictions applicable to other members, undermining the consistent application of term limits and the Code's design of a structured, rotating body.

12. Plaintiff's removal occurred despite a subsequent public statement from Defendant Greene on Nov 17, 2025, asserting that the administration had "no involvement" and "no authority" in Plaintiff's removal.

13. After Plaintiff's removal, Defendants and associated actors restricted PAB member communication with the media and reduced transparency in official records.

14. Throughout his service, Plaintiff performed his duties in an exemplary manner, as evidenced by Mayoral Certificates of Recognition for "outstanding service" awarded on Dec 15, 2023, and Oct 24, 2025.

15. Plaintiff does not seek reinstatement because his original term expires on May 30, 2026. However, this action is not moot because:

a. Plaintiff has suffered completed constitutional injuries;

b. Defendants' interpretation remains in effect;

c. Plaintiff remains subject to that interpretation as a current PAB member and potential ACC appointee; and

d. the challenged conduct is capable of repetition yet evading review.

16. Plaintiff seeks, instead:

    a. declaratory relief clarifying the governing law;

    b. injunctive relief preventing future unlawful removals; and

    c. damages for the injuries he sustained.

17. This case presents a concrete legal question: whether statutory protections governing police oversight officials may be nullified through reinterpretation by municipal actors.

## SECTION 3 — JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

19. Jurisdiction also lies under 28 U.S.C. § 1343(a)(3) and (4), which provide original jurisdiction over actions to redress the deprivation of constitutional and federal statutory rights under color of state law.

20. This Court has authority to grant declaratory and further relief under 28 U.S.C. §§ 2201–2202.

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims occurred in Baltimore, Maryland, and all Defendants reside in the District of Maryland.

## SECTION 4 — PARTIES

22. Plaintiff Jesmond O. Riggins is a resident of Baltimore City, Maryland. He is a duly appointed PAB member and, until the actions of Defendants, served as a sworn and commissioned ACC member.

23. Defendant Mayor and City Council of Baltimore is a municipal corporation organized under the laws of the State of Maryland. It is the legal entity responsible for the policies, practices, and customs of the City of Baltimore, including those adopted and implemented through the Law Department and OECR.

24. Defendant Jamal G. Turner is the PAB Chair. He is sued in both his official and individual capacity. At all times relevant to this action, Defendant Turner acted under color of state law.

25. Defendant Amber W. Greene is the OECR Director and, by virtue of that role, serves as the PAB Director. She is sued in both her official and individual capacity. Defendant Greene participated in the implementation, communication, and institutional adoption of the legal interpretation governing ACC membership and removal and acted with knowledge of its legal implications. At all times relevant to this action, Defendant Greene acted under color of state law.

26. Defendant Caylin A. Young is the former OECR Deputy Director. He is sued in both his official and individual capacity. Defendant Young participated in communications, policy positioning, and conduct relating to Plaintiff's ACC status and removal, including statements reflecting hostility toward Plaintiff's protected speech and supporting the actions taken against him. At all times relevant to this action, Defendant Young acted under color of state law.

## SECTION 5 — FACTUAL ALLEGATIONS

### A. Statutory Framework Governing the PAB and ACC

27. The PAB and ACC were created pursuant to the Maryland Police Accountability Act of 2021 and are governed by both Maryland and Baltimore City law.

28. The ACC is established under Maryland law and local implementing legislation as a quasi-adjudicatory body responsible for reviewing investigatory files and determining whether administrative charges should be brought against police officers.

29. The Code provides for the composition, tenure, and removal of ACC members.

30. The Code requires that ACC composition includes:

   a. Two civilian Mayoral appointees;

   b. Two civilian PAB appointees; and

   c. The PAB Chair, "or another member of the Board designated by the Chair."

31. ACC members serve fixed terms of three (3) years.

32. ACC members are compensated by the City for their service.

33. ACC members may not serve more than two (2) consecutive full terms.

34. ACC members may be removed only by the Mayor and only for cause.

35. Once designated, sworn, and commissioned pursuant to the Charter, ACC members function as independent city officers. These positions do not serve at the pleasure of the Mayor, the PAB or the PAB Chair, but rather carry a fixed term, compensation, defined duties, and removal protections limited to mayoral action for cause.

36. The Code does not grant removal authority to PAB or its Chair.

37. This legal framework reflects a deliberate legislative design to ensure independence, continuity, and protection from arbitrary removal.

## B. Plaintiff's Appointment, Swearing-In, and Service

38. On July 6, 2022, Plaintiff was nominated for appointment to PAB.

39. On February 7, 2023, the Mayor swore Plaintiff into PAB in accordance with the Charter to serve a four-year term; upon his commissioning, Plaintiff signed the Charter test book and received the City seal.

40. At the time, Joshua S. Harris served as PAB Chair and designated Plaintiff as "another member of the Board" to serve on ACC.

41. On May 5, 2023, Plaintiff completed a five-day, 40-hour training from the Maryland Police Training and Standards Commission required by state and local law.

42. On May 30, 2023, the Mayor swore Plaintiff into ACC in accordance with the Charter to serve a three-year term; upon his commissioning, Plaintiff signed the Charter test book and received the City seal.

43. The fixed three-year term was set to expire on May 30, 2026.

44. Plaintiff performed the duties of an ACC member, including reviewing approximately 2,500 investigatory files and participating in charging determinations.

45. Plaintiff's role was substantive, not advisory, and involved the exercise of authority within a statutory oversight body.

46. Plaintiff received bi-weekly compensation for his service as an ACC member.

47. On December 15, 2023, Plaintiff received a Mayoral Certificate of Recognition for "outstanding service" as an ACC member.

## C. Plaintiff's Speech and Advocacy on Matters of Public Concern

48. Plaintiff has a long-standing history of internal advocacy and resisting efforts to consolidate control over civilian oversight, dating back to his service as the OECR Civilian Review Board Supervisor from 2016–2019.

49. Plaintiff consistently spoke on matters of public concern relating to police accountability, oversight structure, and statutory interpretation.

50. Plaintiff publicly advocated for:

    a. legal independence from the Law Department;

    b. operational independence from OECR; and

    c. preservation of ACC's statutory authority, including subpoena power.

51. Plaintiff expressed these views in official proceedings, including communications with ACC members, City Council staff, and public testimony.

52. On October 10, 2025, Plaintiff authored a memorandum analyzing legal interpretations offered by the Law Department and warning that those interpretations conflicted with state and local law. Plaintiff's memorandum concluded that the Law Department's positions would subordinate the ACC to the discretion of the Baltimore Police Department and undermine the statutory oversight framework. Plaintiff recommended seeking clarification from the Maryland Attorney General and engaging City leadership to preserve ACC's authority.

53. Plaintiff's speech was not made pursuant to narrowly defined internal job duties. Plaintiff's role as an ACC member did not require him to provide legal analysis to the City Council or publicly challenge the Law Department's interpretations. Plaintiff's statements, particularly his November 4, 2025, testimony, were made in a public legislative forum, directed to elected officials, outside ACC's chain of command, and constituted speech as a citizen on matters of public concern.

**D. November 4, 2025: Plaintiff's Testimony Before the Public Safety Committee**

54. On November 4, 2025, Plaintiff testified before the Public Safety Committee.

55. Plaintiff's testimony addressed structural and legal deficiencies in the police oversight system.

56. Plaintiff warned that without independence from the Law Department and OECR, PAB and ACC risked becoming ineffective like the Civilian Review Board.

57. Plaintiff highlighted conflicts of interest arising from the Law Department's dual role representing both the police and oversight bodies, and those arising from OECR's dual role in carrying out Mayoral directives and providing administrative assistance to oversight bodies.

58. Plaintiff stated that statutory powers such as ACC's subpoena authority would exist "in name only" if constrained by legal interpretations imposed by the Law Department.

59. Plaintiff emphasized that oversight structures must be insulated from political influence to remain effective.

60. Plaintiff further testified that he intended to speak candidly without "fear [of] being retaliated against."

61. Defendant Young testified against PAB independence.

62. Plaintiff's testimony directly challenged positions held by the Law Department and Defendant Young.

**E. Immediate Reaction to Plaintiff's Testimony**

63. On November 4, 2025, immediately following the hearing, Defendant Young told Plaintiff, "You've got a lot going on with you. You're in trouble." This statement was made in direct response to Plaintiff's testimony.

64. On January 21, 2026, Defendant Young sent Plaintiff a text message to clarify, stating, "To be clear I said you're terrible." In the same communication, Defendant Young directed Plaintiff to "get your facts straight before speaking on my name."

**F. November 5 – November 6, 2025: Pre-Removal Coordination and Statements**

65. On November 5, 2025, the Baltimore Banner published an article about the hearing titled "Mayor's influence over Baltimore Police watchdogs challenged by council chair." The article quoted Plaintiff and described him as "a private attorney who serves on the [ACC]."

66. On November 6, 2025, OECR staff member Jasmine Gibson ("Staff Member Gibson") emailed the author of the article ("Banner Reporter") to request corrections. In her communications, Staff Member Gibson wrote that:

   a. Plaintiff was a PAB member, not an ACC member;

   b. Plaintiff spoke on behalf of PAB, not ACC;

   c. Defendant Turner designated Plaintiff to ACC;

   d. Plaintiff's "temporary appointment ends this week";

   e. Defendant Turner will "resume" Plaintiff's seat;

   f. ACC Chair Tiera Hawkes "asked for Riggins to not speak on behalf of ACC and that Council members direct all requests to her for anything regarding the ACC."

67. The Banner Reporter provided Plaintiff with screenshots of Staff Member Gibson's emails reflecting these statements.

68. Plaintiff immediately circulated a formal written objection to Defendants, citing Baltimore City Code, Art. 1, § 11-10(c)(2), explaining that:

   a. ACC members may be removed only by the Mayor and only for cause;

b.  any attempt would be ultra vires;

c.  unlawful alteration may render future disciplinary decisions subject to challenge; and

d.  no alteration should occur before the Law Department issues a "formal legal opinion clarifying whether a designee may be removed prior to the expiration of their term and under what conditions."

69. Plaintiff also circulated written communication to PAB and ACC members, addressing Staff Member Gibson's statements. In that communication, Plaintiff asserted that he had been designated by former PAB Chair Joshua Harris, had been sworn into a fixed term by the Mayor, and that his service was not temporary. Plaintiff further raised concerns regarding legal authority to alter ACC membership and objected to remove or replace him outside the procedures set forth in the Code.

70. At the time of these communications, Plaintiff had recieved no notice from the PAB Chair, OECR, or the Mayor's Office of any proposed removal or change to his ACC status.

71. At all times relevant to the events described herein, Defendant Turner served as campaign treasurer for Defendant Young, an elected member of the Maryland General Assembly.

## G. November 7 – November 12, 2025: Events Leading to the Removal

72. On November 7, 2025, Defendant Greene circulated a letter in response to Plaintiff's written objection. Defendant Greene denied any attempt by the Mayor or OECR to remove Plaintiff from ACC; stated that the "Law Department opines that the Mayor's ability to remove a member of the ACC is limited to the six reasons listed in City Code,

Art. 1, § 11-10(c)"; and characterized the contents of Staff Member Gibson's email to Banner Reporter as "rumor."

73. On November 8, 2025, Defendant Turner scheduled a virtual "Special Closed Meeting" for November 14, 2025, to address ACC "appointments and designations."

74. On November 10, 2025, Plaintiff circulated written correspondence to Defendants identifying deficiencies in the notice for that meeting, including violations of the Maryland Open Meetings Act. Plaintiff again cited Baltimore City Code, Art. 1, § 11-10(c)(2) and reiterated that PAB and its Chair lack authority to remove ACC members.

75. On November 12, 2025, Defendant Turner denied intention to remove Plaintiff but acknowledged that the law "isn't clear" and that he had requested guidance from the Law Department. Notwithstanding, Defendant Turner asserted that the "law provides each elected Chair the opportunity to either sit on the ACC or have a designee in their stay." Defendant Turner further stated that the law's "language" is silent "around the transition . . . so we haven't figured out how to proceed when a new chair is elected and elects to sit and the sitting designee doesn't want to leave the ACC."

76. The Law Department issued a memorandum dated November 12, 2025, titled "PAB Chair as ACC Member." The memorandum concluded that the ACC seat associated with the PAB Chair is an "ex officio" role that terminates upon a change in chairmanship. The memorandum did not reference or reconcile the removal provision of Baltimore City Code, Art. 1, § 11-10(c)(2).

77. The Law Department's interpretation produced a series of structurally inconsistent outcomes that conflict with the text, structure, and purpose of the governing statute. The interpretation:

a. inverted the City's allocation of executive authority by vesting greater removal power in the PAB Chair, who may remove a designee without cause, process, or explanation, than in the Mayor, who is statutorily restricted to removal only for cause;

b. created a category of member—the PAB Chair—who is insulated from the term limits and cause-based removal provisions applicable to all other ACC members; conversely, it treated the "member of the Board designated by the Chair" (Plaintiff) as removable at will, despite the individual being sworn and commissioned and exercising identical statutory authority; and

c. disrupted the statutory term-limit framework by allowing an individual to continue occupying an ACC seat through successive roles – such as serving first as a designate member and later as PAB Chair – without being subject to the same fixed-term and removal restrictions that apply to other ACC members, thereby undermining the consistent application of term limits and the Code's design of a structured, rotating body.

## H. November 14, 2025: Removal of Plaintiff (Implementation of Challenged Interpretation)

78. On November 14, 2025, the PAB held a virtual special meeting.

79. During the meeting, Defendant Turner ordered OECR staff member Lisa Kelly to circulate the Law Department memorandum to PAB members.

80. Defendant Turner read the Law Department memorandum into the record.

81. Defendant Turner announced that he would replace Plaintiff on the ACC effective immediately.

82. Defendant Turner then opened the floor for discussion.

83. Defendant Turner justified the action as his "choice," permissible under the Law Department's interpretation. He advised, "I was not able to make this kind of decision without a legal interpretation. And with that legal interpretation, I've made my decision."

84. During the ensuing discussion, Defendants Greene and Young denied involvement in Plaintiff's removal. Young characterized Staff Member Gibson's email to Banner Reporter as a "mistake."

85. Plaintiff questioned Defendants Greene and Young regarding who provided the specific content for Staff Member Gibson's email to Banner Reporter. While neither provided a direct answer identifying the source, Defendant Greene stated she would find out from her "team" who provided the information.

86. PAB Vice Chair Joshua Harris publicly challenged Defendant Young's explanation that prior communication regarding Plaintiff's removal was a "mistake." Vice Chair Harris stated that, because Plaintiff was in fact being removed, the email to Banner Reporter was "in alignment with what's actually happening now," and that characterizing it as a mistake was "slightly disingenuous."

87. Following Defendant Turner's announcement, Plaintiff was excluded from further participation in ACC activities, ceased receiving assignments or communications related to ACC matters, and was prevented from exercising any authority associated with his position, while Defendant Turner assumed the seat and its function.

88. The Law Department's November 12, 2025, memorandum was treated by Defendants as binding legal authority governing ACC membership. The City adopted and implemented this interpretation and ratified it by relying on it as the sole basis for Plaintiff's removal,

failing to withdraw or correct it after formal objections, and continuing to apply it in subsequent governance decisions.

### I. Post-Removal Conduct Demonstrating Continuing Retaliatory and Restrictive Practices

89. On November 17, 2025, Defendant Turner circulated an email titled, "Speaking to the Media/Speaking on Behalf of PAB or on PAB/ACC matters." The email provided that "no member of the board besides the Chair is able to speak to the media regarding pab/acc matters unless given authorization in advance" and that "any violation . . . is cause for action from the board."

90. That same day, Defendant Greene emailed Banner Reporter asserting that the administration had "no involvement" and "no authority" in Plaintiff's removal, "rejects any assertion that it is attempting to do so," and "rejects the alleged motive(s) suggested by [Plaintiff]."

91. On December 3, 2025, Plaintiff received a Mayoral Certificate of Recognition dated October 24, 2025, acknowledging his contributions as an ACC member.

92. Plaintiff continued to receive bi-weekly compensation for ACC service after the removal. He received his last ACC paycheck on December 5, 2025 – twenty-one (21) days after his removal.

### J. Subsequent Events, Ratification, and Continuing Harm

93. On January 5, 2026, the PAB, by majority vote, nominated Plaintiff to fill a vacancy on ACC appointed by the Mayor, a seat left unfilled for over 120 days.

94. The Law Department issued a memorandum dated January 30, 2026, advising that PAB cannot nominate members to fill ACC seats appointed by the Mayor; rather, that power shifts to ACC if the Mayor fails to fill such vacancies within 120 days.

95. During the February 2, 2026, PAB meeting, Defendant Turner implemented procedural measures that had the effect of limiting member participation and restricting discussion on substantive matters. Specifically, during a discussion concerning the independence of the police oversight system, Defendant Turner began explicitly counting and monitoring the frequency of individual member responses, particularly those of Plaintiff.

96. During the March 2, 2026, PAB meeting, OECR staff addressed revisions to PAB's record-keeping and digital transparency practices. Staff announced that, in consultation with the Law Department, official meeting minutes would be transitioned to a condensed format, primarily focusing on recording formal actions, motions, and votes rather than providing detailed summaries of PAB deliberations. Additionally, OECR indicated a change in its website posting protocols, stating that the volume of supplemental records and official documentation routinely uploaded to the public-facing site would be reduced.

97. Defendants' interpretation of the Code continues to govern ACC membership and removal.

98. Plaintiff has been deprived of his position without lawful authority.

99. Plaintiff has suffered financial, professional, and constitutional harm.

100. Defendants' actions were undertaken intentionally and with at least reckless disregard for Plaintiff's clearly established constitutional rights.

## SECTION 6 — COUNT I

**First Amendment Retaliation (42 U.S.C. § 1983)**

(Against All Defendants)

101. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Protected Speech as a Citizen on Matters of Public Concern**

102.    Plaintiff engaged in speech protected by the First Amendment.

103.    Plaintiff spoke on matters of public concern, including the independence of the police oversight system; the authority of ACC; the role of the Law Department in police oversight; and the proper interpretation of Baltimore City and Maryland law.

104.    Plaintiff's speech included formal written memoranda, internal communications, and public testimony before the Public Safety Committee on November 4, 2025.

105.    Plaintiff's testimony criticized existing Law Department interpretations of the law and warned that those interpretations would undermine ACC's authority and independence.

106.    Plaintiff's speech was made in public forums and in the context of civic participation and governmental oversight.

107.    Plaintiff's speech is protected under the First Amendment.

108.    Plaintiff spoke as a citizen on matters of public concern. His speech was not made pursuant to his official duties, but addressed systemic legal and structural issues of public importance beyond the scope of his assigned responsibilities.

**Defendants' Awareness of Plaintiff's Protected Speech**

109.    Defendants were aware of Plaintiff's speech and positions.

110.    Immediately following Plaintiff's testimony, Defendant Young told Plaintiff, "You're in trouble." This statement was made in direct response to Plaintiff's protected speech and supports an inference of retaliatory motive.

111.    On January 21, 2026, Defendant Young sent Plaintiff a text message stating, "To be clear I said you're terrible" and directed Plaintiff to "get your facts straight before

speaking on my name." These statements further demonstrate hostility toward Plaintiff's speech.

112.    Prior to Plaintiff's removal, communications from OECR reflected plans to remove Plaintiff and characterized his ACC service as "temporary."

113.    These communications occurred two (2) days after Plaintiff's testimony.

**Adverse Action**

114.    Defendants took adverse action against Plaintiff by removing him from ACC ten (10) days after his testimony.

115.    On November 14, 2025, Defendant Turner announced that Plaintiff would no longer serve on ACC effective immediately and that Defendant Turner would assume the position – approximately six (6) months before the end of Plaintiff's term.

116.    Plaintiff's removal resulted in the loss of his role, responsibilities, and compensation associated with ACC service.

**Retaliatory Motive and Causation**

117.    Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision to remove him from ACC.

118.    Plaintiff's speech directly conflicted with positions advanced by the Law Department and Defendant Young.

119.    Plaintiff publicly challenged the Law Department's interpretation of ACC's authority and warned that it would undermine the statutory framework.

120.    Defendants' proffered justification for the removal relied on a Law Department interpretation that did not address or reconcile the controlling statutory provision governing the removal authority of ACC members.

121.    Defendant Turner stated that the decision to assume Plaintiff's ACC seat was his "choice," reflecting the absence of neutral criteria. He further stated that he was "not able to make this kind of decision without a legal interpretation" and that, "with that legal interpretation, [he] made [his] decision."

122.    Plaintiff's removal occurred ten (10) days after his testimony.

123.    Following Plaintiff's removal, Defendant Turner imposed restrictions on speech and participation within PAB, further evidencing hostility toward dissenting viewpoints.

124.    The totality of circumstances supports a reasonable inference that Plaintiff's protected speech was a substantial factor in his removal.

**Personal Involvement**

<u>Defendant Jamal Turner</u>

125.    Defendant Turner personally decided to remove Plaintiff from ACC.

126.    Defendant Turner announced and implemented the removal on November 14, 2025.

127.    Defendant Turner relied on and adopted the Law Department's interpretation in doing so.

128.    Defendant Turner acted under color of state law and directly caused the deprivation of Plaintiff's rights.

129.    Defendant Turner issued a post-removal directive prohibiting PAB members from speaking with the media about any matters concerning PAB and ACC.

<u>Defendant Amber Greene</u>

130.    Defendant Greene participated in and facilitated the actions leading to Plaintiff's removal.

131.     Defendant Greene was aware of Plaintiff's ACC status and the discussions regarding his removal.

132.     Defendant Greene participated in communications concerning Plaintiff's status and the City's public response.

133.     Defendant Greene's participation in communications and implementation reflects direct involvement in the actions affecting Plaintiff's position.

Defendant Caylin Young

134.     Defendant Young demonstrated hostility toward Plaintiff's protected speech through direct statements and communications.

135.     Defendant Young's statements to Plaintiff immediately following the November 4, 2025, hearing and in January 2026 reflect awareness of and opposition to Plaintiff's speech.

136.     Defendant Young participated in communications and actions concerning Plaintiff's ACC status.

137.     Defendant Young's communications, including statements directed at Plaintiff, occurred contemporaneously with the events leading to Plaintiff's removal and support an inference of participation in the underlying decision-making process.

**Claim**

138.     Defendants, acting under color of state law, retaliated against Plaintiff for engaging in protected speech in violation of the First Amendment.

139.     Plaintiff is entitled to relief under 42 U.S.C. § 1983.

140.   The conduct of the individual Defendants was willful, malicious, and/or in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against them in their individual capacities.

## SECTION 7 — COUNT II

**Procedural Due Process (42 U.S.C. § 1983)**

(Against All Defendants)

141.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Protected Property Interest in Continued ACC Service**

142.   Plaintiff possessed a protected property interest in his position as a member of ACC.

143.   Plaintiff was designated by a former PAB Chair to serve as "another member of the Board," and was subsequently sworn in by the Mayor in accordance with the Charter.

144.   Upon completing a five-day, 40-hour training, and being sworn and commissioned, Plaintiff became a duly qualified ACC member under Baltimore City law.

145.   The ACC position is defined by ordinance, carries substantive authority, and is not discretionary or advisory.

146.   Plaintiff received bi-weekly compensation for his ACC service.

147.   The statutory "for cause" limitation restricts removal to defined circumstances and prevents arbitrary termination; it also creates a legitimate claim of entitlement under state and local law and establishes mandatory substantive and procedural protections.

148.   Plaintiff's interest in continued ACC service constituted a protected property interest under the Fourteenth Amendment.

**Deprivation**

149.     Defendants deprived Plaintiff of his protected property interest by removing him from ACC.

150.     On November 14, 2025, Defendant Turner announced that Plaintiff would no longer serve on ACC and that he would assume the position.

151.     The removal was immediate and effective upon Defendant Turner's announcement.

152.     Plaintiff was excluded from further participation in ACC following that announcement.

**Absence of Lawful Authority (Ultra Vires Conduct)**

153.     The removal was not carried out by the Mayor.

154.     The removal was not for cause.

155.     The removal did not comply with the Code.

156.     Defendants instead relied on a Law Department interpretation that recharacterized Plaintiff's position as "ex officio" and automatically terminated upon a change in chairmanship.

157.     That legal interpretation did not address or reconcile the controlling statutory provision requiring removal by the Mayor and for cause.

158.     By omitting this provision, Defendants eliminated the procedural protections that define Plaintiff's property interest.

**Lack of Process**

159.     Plaintiff was not provided with notice of any proposed removal.

160.     Plaintiff was not provided with any statement of cause.

161.    Plaintiff was not afforded any opportunity to respond.

162.    Plaintiff was not provided with a hearing before or after the deprivation.

163.    The deprivation of Plaintiff's property interest was therefore ultra vires, arbitrary, and contrary to governing law.

**Personal Involvement**

Defendant Jamal Turner

164.    Defendant Turner personally removed Plaintiff from ACC.

165.    Defendant Turner acted without statutory authority and without providing any process.

166.    Defendant Turner's actions directly caused the deprivation of Plaintiff's protected property interest.

Defendant Amber Greene

167.    Defendant Greene participated in and facilitated the implementation of the actions that resulted in Plaintiff's removal.

168.    Defendant Greene was aware of Plaintiff's status and the legal issues surrounding removal.

169.    Defendant Greene's actions and omissions contributed to the deprivation.

Defendant Caylin Young

170.    Defendant Young participated in communications and conduct relating to Plaintiff's removal.

171.    Defendant Young's actions, including statements reflecting hostility toward Plaintiff, demonstrate awareness of Plaintiff's role and rights.

172.    Defendant Young's conduct contributed to the arbitrary deprivation of Plaintiff's protected property interest.

**Claim**

173.    Defendants, acting under color of state law, deprived Plaintiff of a protected property interest without due process of law in violation of the Fourteenth Amendment.

174.    Plaintiff is entitled to relief under 42 U.S.C. § 1983.

175.    The conduct of the individual Defendants was willful, malicious, and/or in reckless disregard of Plaintiff's constitutional rights, entitling Plaintiff to punitive damages against them in their individual capacities.

## SECTION 8 — COUNT III

**Declaratory Relief (28 U.S.C. §§ 2201–2202)**

(Against All Defendants)

176.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Actual, Present, and Justiciable Controversy**

177.    An actual, present, and justiciable controversy exists between Plaintiff and Defendants regarding the proper interpretation and application of the laws governing the composition, tenure, and removal of ACC members.

178.    Defendants have adopted and implemented a legal interpretation that the ACC seat associated with the PAB Chair is an "ex officio" role that terminates upon a change in chairmanship and may be reassigned at the Chair's discretion.

179.    Plaintiff contends that this interpretation is contrary to governing law.

180.    Specifically, Baltimore City law provides that ACC members serve fixed three-year terms; and may be removed only by the Mayor and only for cause.

181.    Plaintiff further contends that the statutory role of "another member of the Board designated by the Chair" does not create a temporary or at-will position.

182.    Once designated, sworn, and commissioned pursuant to the Charter, such members serve as independent ACC members subject to the same statutory protections as all other ACC members.

183.    Defendants' interpretation omits and conflicts with the statutory limitation on removal authority.

184.    Defendants' interpretation has been applied to remove Plaintiff and continues to govern ACC membership.

**Need for Judicial Determination**

185.    The dispute presents a purely legal question regarding the meaning and application of the Code.

186.    Judicial resolution is necessary to:

a. clarify the governing law;

b. determine the limits of authority of the PAB and its Chair; and

c. prevent future unlawful removals.

187.    The controversy is concrete, ongoing, and capable of repetition.

188.    Absent judicial intervention, Defendants will continue to apply an interpretation that conflicts with governing law.

**Requested Declarations**

189.    Plaintiff seeks a declaration that:

190.    ACC members serve fixed terms as prescribed by the Code.

191.    ACC members may be removed only by the Mayor and only for cause pursuant to the Code.

192.    The statutory role of "another member of the Board designated by the Chair" does not create an at-will or temporary position.

193.    The PAB Chair does not possess unilateral authority to remove or replace an ACC member.

194.    The interpretation and application of the governing law by Defendants, as described herein, are inconsistent with the Code.

**Claim**

195.    Plaintiff is entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201–2202.

**SECTION 9 — COUNT IV**

**Injunctive Relief**

(Against All Defendants)

196.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Ongoing and Prospective Harm and Risk of Repetition**

197.    Defendants have adopted and implemented an interpretation of Baltimore City law that permits the removal or replacement of ACC members without compliance with the Code.

198.    That interpretation has already been applied to remove Plaintiff from ACC.

199.     The interpretation continues to govern the conduct of Defendants and the operation of the PAB and ACC.

200.     Plaintiff remains subject to Defendant's interpretation as a current PAB member and as an individual eligible for future ACC service, and therefore faces a real and immediate risk of repeated injury.

201.     Absent judicial intervention, Defendants are likely to continue applying this interpretation in future decisions affecting ACC membership.

202.     The continued application of this interpretation creates a substantial risk that ACC members will be removed or replaced without mayoral action; without cause; and without procedural protections.

203.     This ongoing practice undermines the statutory framework established by the Code.

204.     The practice threatens the independence and integrity of the police oversight system.

205.     The conduct at issue is susceptible to recurrence while simultaneously escaping judicial scrutiny as ACC terms are limited in duration and Defendants' interpretation permits removal before judicial review can be completed.

**Irreparable Harm**

206.     Plaintiff has suffered irreparable harm as a result of Defendants' actions.

207.     Plaintiff's removal from a statutorily protected public office constitutes an ongoing deprivation of constitutional rights.

208.     Plaintiff has suffered loss of position, loss of professional standing, and constitutional injury.

209.    These injuries cannot be fully remedied by monetary damages alone.

**Balance of Equities and Public Interest**

210.    The balance of equities favors injunctive relief.

211.    Requiring Defendants to comply with governing law imposes no undue burden.

212.    The public interest strongly favors enforcement of statutory safeguards governing police accountability.

213.    The public also has a strong interest in ensuring that civilian oversight bodies operate independently and in accordance with law.

**Requested Injunctive Relief**

214.    Plaintiff seeks an order enjoining Defendants from:

   a.    Interpreting or applying the Code in a manner that permits removal or replacement of ACC members without compliance with statutory requirements.

   b.    Removing or replacing individuals serving as "another member of the Board designated by the Chair" except in accordance with governing law, including removal by the Mayor and for cause.

   c.    Implementing or enforcing policies or practices that treat ACC membership as an at-will position subject to unilateral control by the PAB Chair.

**Claim**

215.    Plaintiff is entitled to injunctive relief to prevent ongoing and future violations of law and constitutional rights.

**SECTION 10 — COUNT V**

**Municipal Liability (Monell) — 42 U.S.C. § 1983**

(Against Defendant Mayor and City Council of Baltimore)

216.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Official Policy, Practice, or Custom**

217.     The constitutional violations suffered by Plaintiff were caused by an official policy, practice, or legal position adopted by Defendant Mayor and City Council of Baltimore.

218.     The Baltimore City Law Department functions as the City's final authoritative interpreter of law for municipal agencies.  While acting in its policymaking authority for the City, the Law Department formulated and advanced a formal legal interpretation concerning the ACC seat associated with the PAB Chair.

219.     That interpretation asserted that the ACC position is an "ex officio" role that terminates automatically upon a change in chairmanship and may be reassigned at the unilateral discretion of the Chair.

220.     This interpretation constituted an official legal position and policy of the City.

221.     The interpretation was formally communicated to and relied upon by Defendant Turner as the sole legal authority for removing Plaintiff from his fixed three-year term. Defendant Turner, Greene and Young treated the interpretation as binding guidance and not subject to further review within the City structure.

222.     The interpretation was implemented through OECR, with the direct participation of Defendants Greene and Young.

223.     The City's policy omitted the controlling statutory mandate found in Baltimore City Code, Art. 1, § 11-10(c), which provides that ACC members may be removed only by the Mayor and only for cause.

224.     By adopting this recharacterization, the City established a framework that, among other things:

   a.  converted a protected, compensated public office into an at-will position;

   b.  Resulted in the exercise of greater removal power by the PAB Chair than by the Mayor;

   c.  subjected individuals exercising identical statutory authority to materially different tenure and removal protections;

   d.  allowed ACC membership to be altered without compliance with statutory removal requirements; and

   e.  enabled continued occupancy of an ACC seat through successive roles without adherence to the fixed-term and removal structure applicable to other members.

**Decision by Final Policymaker and Ratification**

225.     The Law Department functioned as the final authoritative source of legal interpretation for City agencies, and its Nov 12, 2025, memorandum was treated as binding guidance governing the Defendants' conduct.

226.     Defendant Turner adopted and implemented this policy in his official capacity as PAB Chair. Defendant Turner expressly confirmed that his action was taken in reliance on the Law Department's interpretation. He stated that he was "not able to make this kind of decision without a legal interpretation" and that, "with that legal interpretation, [he] made [his] decision."

227.    Defendants Greene and Young facilitated and carried out the implementation of this policy through OECR.

**Deliberate Indifference to Known Legal Violations**

228.    The actions taken pursuant to this interpretation were ratified by the City, as evidenced by the absence of corrective action following Plaintiff's formal protests and the administration's continued reliance on the "ex officio" recharacterization.

229.    Alternatively, the City ratified the unconstitutional conduct by knowingly approving and continuing to apply the interpretation after Plaintiff's formal objections and the legal deficiencies were brought to its attention.

**Causation**

230.    This official City policy was the moving force behind the violations of Plaintiff's constitutional rights.

231.    But for the Law Department's interpretation and its adoption by the Defendants, Plaintiff would not have been removed from his statutorily protected office.

232.    The policy directly caused Plaintiff's removal from public office without procedural due process, and retaliation for Plaintiff's protected speech regarding oversight independence and governance.

**Claim**

233.    Defendant Mayor and City Council of Baltimore is liable under 42 U.S.C. § 1983 for the policies that resulted in the deprivation of Plaintiff's First and Fourteenth Amendment rights.

**SECTION 11 — COUNT VI**

**Maryland Declaration of Rights (Articles 40 and 24)**

(Against All Defendants)

234.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**Violation of Article 40 (Freedom of Speech)**

235.    Plaintiff's speech is protected under Article 40 of the Maryland Declaration of Rights.

236.    Plaintiff spoke on matters of public concern, including the structure, independence, and legality of the City's police accountability system.

237.    Defendants retaliated against Plaintiff for engaging in protected speech, in violation of Article 40.

238.    Article 40 is interpreted *in pari materia* with the First Amendment and provides coextensive protection for speech on matters of public concern.

**Violation of Article 24 (Due Process)**

239.    Plaintiff possessed a protected property interest in his ACC position under Maryland law.

240.    Defendants deprived Plaintiff of that interest without due process of law, in violation of Article 24 of the Maryland Declaration of Rights.

241.    Defendants' actions were arbitrary, capricious, and without legal authority under Maryland law.

**Claim**

242.    Plaintiff is entitled to damages and appropriate relief under Maryland law for violations of Articles 40 and 24.

## SECTION 12 — PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

**Declaratory Relief**

A. Declare that, under the Baltimore City Code:

1.  ACC members serve fixed terms;

2.  ACC members may be removed only by the Mayor and only for cause;

3.  The statutory role of "another member of the Board designated by the Chair" does not create an at-will or temporary position;

4.  The PAB Chair does not possess unilateral authority to remove or replace an ACC member;

5.  Defendants' interpretation and application of the governing law are inconsistent with the Code;

**Injunctive Relief**

B. Issue injunctive relief:

1.  Prohibiting Defendants from interpreting or applying the Code in a manner that permits removal or replacement of ACC members without compliance with statutory requirements;

2.  Prohibiting Defendants from removing or replacing individuals serving as "another member of the Board designated by the Chair" except in accordance with the Code;

**Damages**

C. Award Plaintiff compensatory damages in an amount to be determined at trial;

D. Award punitive damages against the individual Defendants, in their individual capacities, in an amount to be determined at trial for their willful and reckless disregard of Plaintiff's constitutional rights;

E. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law, to the extent Plaintiff retains counsel or otherwise becomes entitled to such fees;

F. Award such other and further relief as the Court deems just and proper.

## SECTION 12 — JURY DEMAND

243.     Plaintiff demands a trial by jury on all issues so triable.

## SECTION 13 — SIGNATURE BLOCK

Respectfully submitted,

7/20/2026

Jesmond O. Riggins
Plaintiff, Pro Se

1622 Northwick Road
Baltimore, MD 21218
(443) 865-4786 (c)
jesmondr@gmail.com